IDA HALLEN v. MONTGOMERY WARD & COMPANY, INC.
AND OTHERS.[1]

September 9, 1938.

No. 31,687.

*Doherty, Rumble, Butler, Sullivan & Mitchell,* for appellants.
*Harvey J. Diehl,* for respondent.

HOLT, JUSTICE.

In this action for false arrest and malicious prosecution plaintiff had a verdict for $3,985. Defendants moved for judgment notwithstanding the verdict or a new trial. The court denied judgment but granted a new trial unless plaintiff consented to reduce the verdict to $2,000. Plaintiff consented, and defendants appeal.

Plaintiff's testimony, virtually wholly uncorroborated, made a case for the jury. But a careful consideration of the whole record is so convincing that defendants proved not only probable cause, but good cause, for plaintiff's apprehension and prosecution for petit larceny that in the interest of justice there should be a new trial. It is therefore necessary to state more of the purport of the testimony than is desirable in a decision.

Plaintiff's story is in short this: In the afternoon of Saturday, February 27, 1937, she left her home in St. Paul, Minnesota, located about three-fourths of a mile south from the retail department store of Montgomery Ward & Company, Inc., hereinafter referred to as Ward's store, to look at shoes advertised by said store in the local paper the evening before. She brought along a black straw hat purchased about two weeks before at the Dotty Dunn Hat Store, downtown, for the purpose of exchanging it, after looking at the shoes. On the way to Ward's store she stopped four blocks from her home, at the National Tea Store on Dayton and Snelling avenues, and purchased two cans of Log Cabin syrup. She carried her hat in a paper bag and put the syrup cans in another paper bag, walked to Ward's store, and on the first floor looked at the shoes advertised. They did not suit her. She looked at some dresses and aprons at a near-by counter, then went to the basement, bought for ten cents a can of Three-In-One oil, and placed it in the bag

with the syrup cans. On the way up from the basement she stopped at the candy counter and bought 15 cents worth of candy bars, and, having concluded not to go to town to exchange her hat, she turned to go home by the south or rear entrance of Ward's store, and was arrested in the doorway by defendant Mrs. Jensen, the private detective of Ward's store, and her purse and paper bags taken, and she was taken to the office of Mr. Drew, the assistant chief of the detectives of Ward's on the third floor, where the contents of the paper bags were emptied on a table, and she was accused of having taken the hat, the syrup cans, and the oil can from the store. After some questions, police officers with a squad car were called. Plaintiff denied the accusation, told them where she had bought the hat and cans of syrup, and asked them to verify that as well as that she had paid the clerk for the can of oil. She says they refused, said she was crazy, that she could explain to the judge of the police court. The paper bags and the articles mentioned were put in a large shopping bag by Mr. Drew and turned over to the police officers, who took the same and plaintiff to the city lockup. Plaintiff was placed in jail and charged in the municipal court Monday morning with petit larceny. She pleaded not guilty, was released on $100 bail furnished by her husband, and the trial set for March 4, 1937. On the trial before the court, without a jury, Mrs. Jensen and Mr. Drew were called as witnesses for the state, and plaintiff and Mr. Nash, the clerk at the National Tea, who had sold her two cans of Log Cabin syrup, testified in defense. She was acquitted. It must be conceded that plaintiff made a *prima facie* case.

However, a consideration of the whole record herein has convinced a majority of the court that defendants so overwhelmingly proved probable cause for the detention and prosecution of plaintiff for petit larceny that a new trial should have been granted rather than an attempt made to mitigate the wrong of an excessive verdict by cutting it in two. It is common knowledge that large department stores suffer so from the depredations of shoplifters that private detectives are necessary for protection. Mrs. Jensen and Mr. Drew were so employed. But surely there is as much need to scrutinize

the testimony of plaintiff as one vitally interested as that of Mrs. Jensen or Mr. Drew. The articles involved in the charge were a black straw hat, two cans of Log Cabin syrup, a ten-cent can of oil, and a kettle or pan lid. Plaintiff denied that the lid was in her bags; but the evidence is conclusive that it was on the table in Drew's office, was an exhibit at the criminal trial as well as on this trial. All the articles mentioned were received as exhibits in both trials. Plaintiff at this trial vehemently claims that the black straw hat in the paper bag taken from her when apprehended is not the one Drew placed in the shopping bag delivered to the police officers; but she makes no claim that there was any substitution of the cans of syrup. The same attorney who now represents plaintiff defended her in the criminal trial, and in this trial Mr. Rumble represented defendants. Both attorneys displayed great skill and zeal for their clients, but neither one has even suggested that the other has contrived or been cognizant of any attempt to substitute any other article for any of the ones in plaintiff's paper bags at the time of her apprehension by Mrs. Jensen. In fact the professional standing of both counsel is such that it is unthinkable that either one would tolerate any trick or scheme by which there was a substitution or change of any article or exhibit involved in these trials.

This is a brief statement of the salient points of defendants' evidence. Mrs. Jensen testified that she first noticed plaintiff in the shoe department of Ward's store on the first floor, holding an open paper bag in front of her with the left hand, her purse being held under her left arm, and picking up and handling shoes with the right while continuously looking all around. Mrs. Jensen concluded to shadow her and spoke to Miss Ralstad in charge of the adjoining notion counter; that she, Mrs. Jensen, followed plaintiff without coming too near, observed her actions at the notion counter, then at the near-by millinery department, where plaintiff began to look at hats, picking them up and examining them, taking off her own and trying one on, then taking it off and putting on her own; she then picked up the black straw hat now received in evidence, carried

it in her hand with the paper bag, walked toward the wall of the department, looking around, turned at the dress rack and around the same, and, as she so did, she put the hat in the bag, closed the bag, and went to where the suede jackets were displayed. Mrs. Jensen spoke to Miss Bruels, a saleswoman in that department. Mrs. Jensen testified that she saw plaintiff fumbling with her hands in front of her, then came back, started for the house-dress department, having another paper bag that looked empty in her right hand, holding in her left the bag in which she had placed the hat; that after looking at some articles there plaintiff walked toward the lobby and then to the rear entrance. Mrs. Jensen then spoke to Mr. McCaul and Mr. Fishbak in charge of the refrigerator department, stating that plaintiff had taken a hat and she, Mrs. Jensen, wanted their help—since her instructions are not to arrest a shoplifter in the store, but wait until outside the door. Mrs. Jensen and one of these two men testified that plaintiff went to the vestibule of the rear entrance, and, after waiting there some minutes, again reëntered the store. Mrs. Jensen then followed plaintiff to the grocery department on the floor below where she took a can of Log Cabin syrup from the shelf, put it in the empty paper bag, went to the counter where cereals are displayed, came back to the shelf and took another syrup can, and transferred it to the paper bag. Mrs. Jensen spoke to Mr. Lane, a clerk in that department. Thereafter plaintiff went to the houseware department, took a ten-cent can of Three-In-One oil, and put it in the bag with the syrup cans, then went to where kettles and pans were displayed, picked a lid from a kettle and put it in the bag with the cans and left for the lobby, stopping at the candy counter to purchase some candy, then went toward the rear entrance. Mr. McCaul and Mrs. Jensen followed, and when plaintiff was some 40 feet away from the door Mrs. Jensen detained her, taking both paper bags and her purse from her and took her to Drew's office on the third floor, where the articles were taken out of the bags and laid on the table. Plaintiff was accused of stealing the hat, the cans of syrup, the can of oil, and the kettle lid. She denied the charge. Mrs. Jensen and Drew noticed that

the price tag of the hat was missing, and Mrs. Jensen took the hat down to the department to ascertain the price. There, on the floor, about where she had seen plaintiff place the hat in the paper bag, was the price tag, in a condition indicating that the hat to which it had been attached had not been sold. The police officers present, Mr. Drew, and Mrs. Jensen all testified that the identical articles mentioned taken from plaintiff's two paper bags and lying on the table were by Mr. Drew placed in a large shopping bag and taken away by the police officers to the city lockup, where the same have been kept since except when brought into court by the officer in charge. Mrs. Jensen's story, as above outlined, was in many respects verified by the clerks above mentioned to whom she spoke and by Miss Pope and Miss Gran, clerks in the millinery department; also by admissions made by plaintiff to the policewomen who had her in custody while under arrest. And there is corroboration also in the fact that the two syrup cans had the price marked on them in the handwriting of Mr. Burden in charge of the grocery department in Ward's store. Whereas Mr. Nash, who testified for plaintiff that he sold her two cans of the same brand of syrup, stated that the cans he sold had no price or other identification marks. There is no claim of plaintiff that the syrup cans were changed on her, but that the hat was. The claim that Mrs. Jensen should have taken the hat plaintiff had in her paper bag when apprehended from the table in Drew's office and deliberately exchanged it for one in Ward's millinery stock is so unreasonable as to be unworthy of belief.

Plaintiff admitted that she had no sales slip from the Dotty Dunn store when she claims she started from home to exchange the hat, but that she found it in her basement before her trial in the municipal court, and it was there introduced as an exhibit and in this trial as exhibit J. The two handwriting experts, who testified, agreed that exhibit J is the original or duplicate of exhibit 5. The latter contained at the place for date these marks, "3-1," and on the third line from the top "1253," whereas on exhibit J no figures or marks appear where the quoted numbers should be. Professor

Caton, plaintiff's expert, is of opinion that someone has traced the date and the number "1253" on exhibit 5. Dr. Dalton, defendants' expert, is of the opinion that those figures were obliterated on exhibit J. That exhibit shows use and has a large part torn off from the upper left corner and also some of the lower part. But Miss Thom, the saleswoman of Dotty Dunn store, testified positively that every number upon exhibit 5 was in her handwriting. According to that testimony, the sales slip exhibit J represents a purchase made by plaintiff March 1, 1937, the day she was arraigned in the municipal court and released on bail, and not a purchase previous to the date of her arrest. So Miss Thom, a wholly disinterested witness, confirms the opinion of Dr. Dalton that the hat represented by the sales slip produced by plaintiff, exhibit J, was purchased March 1, 1937. Hence Mrs. Jensen did not substitute the hat taken from plaintiff for one in the Ward's stock. Plaintiff was seated near the table in Drew's office where the articles she was accused of stealing were placed, and she must have been much alive to what was being done. She then claimed that Mrs. Jensen pinned Ward's price tag on her (plaintiff's) hat. She did not then nor now claim that the syrup cans now in evidence were substituted for those she bought of Nash.

We have not referred to the testimony of the policewomen who had plaintiff in custody, or to that of the police officers, which strongly tends to sustain the charge of petit larceny against plaintiff. Nor do we think it worth while to refer to the so-called impeachment of Mrs. Jensen's testimony in municipal court trial by casual listeners. There was no reporter. Even if an inadvertent use of "felt" instead of "straw" occurred in Mrs. Jensen's testimony, it is of no significance. From start to finish the hat involved was one of black straw. The summary of evidence is too long; but still more could be stated in support of the claim that probable cause for the arrest and prosecution of plaintiff for petit larceny was overwhelmingly proved. It is so incredible that all the clerks and saleswomen in Ward's store and in Dotty Dunn's store who testified would deliberately conspire to fasten the offense of a petty

shoplifter upon a person to them wholly unknown that it staggers belief.

Defendants moved for a new trial on the ground "that the verdict of the jury and the damages awarded the plaintiff thereby are excessive, appearing to have been given under the influence of passion or prejudice." In this court error is assigned on the refusal to grant a new trial on the same ground. The verdict was excessive. The trial court so concluded and granted a new trial unless plaintiff consented to its reduction to almost one-half. Where the right of recovery is clearly established but the jury's award is unreasonably high, the practice of cutting down the verdict is well established. But where the verdict, in addition to being excessive, is against the great weight of the evidence, there should be a new trial rather than a cutting down of the verdict. In the early case of Woodward v. Glidden, 33 Minn. 108, 22 N. W. 127, a new trial was indicated where the verdict was grossly excessive even though plaintiff was clearly entitled to recover. That rule was applied in Roemer v. Jacob Schmidt Brg. Co. 132 Minn. 399, 157 N. W. 640, L. R. A. 1916E, 771, and in McDermott v. M. St. P. & S. S. M. Ry. Co. 176 Minn. 203, 223 N. W. 94, where the trial courts undertook to reduce excessive verdicts and this court reversed and granted new trials. The last cited case was for false arrest; but the wrong and damages resulting are of the same type as here involved. The reduction of the verdict there was from $3,500 to $1,800. It is true that reduction of verdicts in even greater proportion than in the instant case have been sustained by this court. Wallerick v. McGill-Warner Co. 154 Minn. 341, 191 N. W. 604, and the cases therein referred to. But, in our opinion, those cases presented no such clear and convincing defense as here. In the case at bar there is no evidence warranting a finding of actual malice on the part of any defendant and no occasion to award large punitive damages. Where actual malice is proved justifying heavy punitive damages, or where large pecuniary interests or grave moral wrongs are involved, verdicts much larger than herein rendered have been sustained, as in Price v. M. D. & W. Ry. Co. 130 Minn. 229, 153 N. W. 532, Ann. Cas. 1916C, 267; Sticha v. Benzick, 156 Minn. 52, 194 N. W. 752; Wolley

v. Chapman, 175 Minn. 184, 220 N. W. 604. In Woodward v. Glidden, 92 Minn. 108, 110, 22 N. W. 127, 128, where the false arrest was "wholly and inexcusably illegal and unjustifiable," warranting both compensatory and punitive damages, the court, in granting a new trial because the verdict of $2,917 was deemed grossly excessive, gave this admonition, which bears repetition now:

"In conclusion we avail ourselves of this opportunity to suggest to the faithful and able magistrates who adorn our district bench that in our unanimous opinion nothing will go further to redeem the institution of trial by jury from the popular and professional disrepute into which it has in some degree fallen, and to restore it, in some measure at least, to its ancient reputation, than a judicious assumption of responsibility in regulating and controlling the action of juries by the trial courts."

Defendants assign other grounds for the reversal of the order appealed from, but, in view of a new trial, those alleged errors may not then arise.

The order is reversed and a new trial granted.

PETERSON, JUSTICE (dissenting).

The verdict should stand because it is for the jury and not the court to decide disputed questions of fact upon conflicting evidence. We have no right to substitute our notions for those of the jury on fact questions except where we can say as a matter of law that the evidence does not sustain the verdict.

The evidence in favor of defendants is not more persuasive than that of plaintiff. The majority comes to the conclusion that defendants' evidence is more persuasive because it misconceives certain evidence relative to the sales slips, defendants had a larger number of witnesses, plaintiff was uncorroborated, and a misunderstanding of plaintiff's claims with respect to the substitution of the cans of syrup.

The evidence does not justify the conclusion reached by the majority that the copy of the sales slip, defendants' exhibit 5, proves that plaintiff purchased the black straw hat at the Dotty Dunn Hat

Store on March 1, 1937. On the contrary, the evidence compels a finding that plaintiff purchased the hat at the time she claimed she did, about two weeks prior to her arrest. The original sales slip, plaintiff's exhibit J, was dated "——— 1937," and had written on it "black straw hat," "$1.88," and "23," to indicate price and size. That is all that was written on it. Parts of the top and bottom of the slip were torn off. The copy, defendants' exhibit 5, retained by the Dotty Dunn Hat Store, was not torn. In addition to what appeared on the original, it contained in carbon the figures "3-1" preceding the date "1937," the clerk's number "4" in the space provided for that purpose, the number "1253," and the full serial number at the bottom. Insofar as the copy contains what was on the original, it is concededly a true duplicate copy, made by carbon impression at the same time the original was written. If all the writing appearing on the copy had been written on the original at the time it was issued, the stock number "1253" and practically all of the clerk's number "4" and the "3-1" before the "1937" would have appeared on the original as torn.

If the original and copy were made at the same time, then the date and the other matter appearing on the copy which does not appear on the original were erased on the original. On the other hand, if the matter not appearing on the original but appearing on the copy was added to the latter, such addition was made by writing on a paper superimposed on a carbon placed over the copy after the original had been issued. The date "3-1" before the "1937" to indicate March 1, 1937, was such an addition to the copy. Whether there was an erasure on the original was therefore determinative of the issue whether the date "3-1" was written on the original at the time it was issued or was added to the copy afterward. It is on this issue that the majority entirely misconceives the evidence. It assumes that Dalton gave an opinion that defendants' exhibit 5 is a true copy of plaintiff's exhibit J. This is not true. His opinion simply was that insofar as defendants' exhibit 5 contained the matters appearing on plaintiff's exhibit J, it was a true and correct copy. He was unable to account for the matters on

the copy which did not appear on the original. As to those matters, he declined to give any opinion at all. After considerable hedging, he stated point-blank that he could not give an opinion as to such matters. At one point he stated: *"On the condition it is here; I would not risk any opinion at all."*

Mr. Caton testified that erasures would have left marks on the paper which would have been discernible either by the naked eye or by the use of light and glasses. This is a matter of common opinion. Dalton's testimony tends to corroborate Caton's that there was no erasure on the original. Mr. Caton testified that if there were no erasures on the original, matters not appearing on the original were added to the copy in the manner stated, after the original was issued. This seems self-evident. Defendants' evidence was silent upon this point. Even the witness Thom does not say that the original was made on March 1. Under the circumstances, the date on the copy does not prove the date of the sale. It is significant in this connection that the witness Thom testified that all the handwriting on the copy was hers, but that she would not say that exhibits J and 5 were duplicates, because of the presence on exhibit 5 of matters not on exhibit J. She could not explain when or how the other writing was done. There is a suggestion that all the handwriting on exhibit 5 was not Miss Thom's. In view of the evidence that many of the slips were misdated (only the copies are kept by the store), and some were not dated at all, some explanation was required as to how the copy happened to be dated when the original was not, and this evidence was not forthcoming. The only evidence as to the date of the issuance of the slip was the uncontradicted testimony of plaintiff. The jury was justified in finding that plaintiff bought the hat from Dotty Dunn, not on March 1, but when she says she did.

If defendants' evidence is to be held more persuasive, it must be because they have the greater number of witnesses. But this is not a proper test by which to determine the weight of evidence. The weight of evidence is determined not by a count of the witnesses but by its belief-inducing effect. No matter what the issue or who

the person, the testimony of one person may sustain the weight of the evidence.  Benson v. Northland Trans. Co. 200 Minn. 445, 274 N. W. 532; 4 Wigmore, Evidence (2 ed.) § 2034.

Defendants' evidence is so full of improbabilities, inconsistencies, and bias as to justify the jury in not believing it.  Jensen and Drew gave two versions of what occurred.  First in the police court, after Drew had consulted with the city prosecutor, he and Jensen were produced as witnesses for the prosecution.  Jensen testified that no person other than herself knew anything about the actual thefts. Their version of the case was rejected by the judge of the municipal court.  In the light of this experience, it is reasonable to believe that they conceived that it was necessary to bolster up their case in order to persuade a jury to accept their version.  The other witnesses were produced to fill in the picture given by Jensen and Drew.  It is conceded that Jensen shadowed the plaintiff, and it is reasonable to believe that she made a mistake which she tried to cover up with the aid of Drew.  Plaintiff became defiant when she was arrested, and both of them realized that the apprehension of plaintiff was sure to cause them trouble later.  Ward's system of suppressing thefts of merchandise was calculated to bring about the result that happened.  Suppressing thefts by the arrest of those whom it believed to be guilty was bound to result in mistakes.  It is fair to infer that the success of Jensen and other detectives was measured by the number of arrests which they made.  Such a system created pressure to make arrests.  Jensen and Drew had every incentive to make arrests in order to demonstrate to Ward's that they were capable detectives.

Much of the evidence bears out plaintiff's version.  It appears without dispute that plaintiff purchased the two cans of maple syrup at the National Tea Store for 46 cents on the afternoon of February 27, 1937; that she purchased a black straw hat at the Dotty Dunn Store; that the hat in plaintiff's possession when she was arrested by Mrs. Jensen, and which Mrs. Jensen took from her, did not have a Montgomery Ward label or tag on it; that plaintiff had an undated purchase slip for the hat, issued by the Dotty Dunn

Store; that Mrs. Jensen shadowed and then apprehended the plaintiff; that Drew had the police officers arrest plaintiff on a charge of petit larceny; that plaintiff was taken to the police station, where she was confined, and later to the police court, where she was tried and acquitted.

Plaintiff claimed that there was a substitution of both the hat and the syrup. The evidence sustains her claims. A large part of the record is devoted to proof of the substitution. The court below discussed it at length in the memorandum.

In District of Columbia v. Clawans, 300 U. S. 617, at p. 630, 57 S. Ct. 660, 664, 81 L. ed. 843, the court stated the rule which applies to the testimony of Jensen and Drew: "All were private police or detectives, apparently acting in the course of their private employment. Common experience teaches us that the testimony of such witnesses, especially when uncorroborated, is open to the suspicion of bias." See 2 Wigmore, Evidence (2 ed.) § 969. We applied the rule in State v. Bryant, 97 Minn. 8, 105 N. W. 974; State v. Meyers, 132 Minn. 4, 155 N. W. 766; State v. Thorvildson, 135 Minn. 98, 160 N. W. 247; State v. Oberman, 152 Minn. 431, 189 N. W. 444; State v. Bailey, 177 Minn. 500, 225 N. W. 431; State v. Nickolay, 184 Minn. 526, 239 N. W. 226; 6 Dunnell, Minn. Dig. (2 ed. & Supps.) § 10346.

Some of defendants' evidence is open to suspicion. Drew testified that Mrs. Jensen had been 100 per cent correct and had never made a mistake. While such a statement may be true, there is nothing about it to compel belief. On direct examination Jensen testified that neither she nor any store for which she had worked had been sued for malicious prosecution as a result of arrests made by her. This statement was false. The fact was that a former employer had been sued on account of such an arrest made by her. Defendants' counsel, realizing the importance of the matter, interrupted the cross-examination and had her testify to the truth of the matter. Whether she made a mistake or whether she knowingly testified falsely was for the jury to say. If they believed that she testified falsely in the first instance they were justified in rejecting her

testimony altogether. Jensen's testimony in the police court that there were no other witnesses went directly to the weight of the testimony of the witnesses produced afterwards upon the trial below. The relationship of these witnesses to Ward's and to each other by reason of their employment suggests "untrustworthy partiality." 2 Wigmore, Evidence (2 ed.) §§ 945, 949, note 4. Their stories run afoul so many probabilities as not to compel belief. Whether they were able to identify the plaintiff four or five months after the alleged thefts was questionable. Plaintiff was dressed in winter clothes at the time she was in the store in February, and in summer clothes when the trial was had in June. The majority opinion ascribes to these witnesses powers of observation and memory which people generally do not have.

The clerks from the various departments claimed that plaintiff stole the goods publicly in their and Jensen's presence, without any effort on her part to avoid detection and apprehension. Some of them claimed that plaintiff, with the stolen hat in her possession, knowing that she was being watched by Jensen, stood for ten minutes at the rear entrance and then returned to the basement where she stole the syrup and Three-In-One oil, within four feet of Jensen and other employes who were then watching her. It is improbable that plaintiff, knowing that she was being watched as a thief and with loot on her, would return to the store to commit further thefts in plain sight and within arm's length of the officer who was shadowing and watching her as a thief. Under such circumstances, she would probably try to get rid of the loot to avoid detection rather than make sure of her arrest with the proof of her guilt on her.

The failure to produce the clerk from the oil department is significant. She was the only clerk with whom plaintiff admitted any transaction affecting the merchandise in question. The presumption in such cases is that the party did not produce the witness because his testimony would not have been favorable to such party. The jury had a right to infer that the reason this witness did not testify was because she would not testify that plaintiff did not buy the can of oil from her.

The testimony of the policewomen was contradicted by plaintiff. The rules of the police department require reports of all confessions and admissions to the chief, and it was the duty of the police court officer to take such confessions and admissions to the police court for the use of the city prosecutor in the prosecution of the case. Yet no report of confessions or admissions was made by these women although they were familiar with the practice of the police department. The testimony of one of them is susceptible of the construction that the plaintiff told her that she was arrested on a charge of having stolen merchandise from Ward's and not that she admitted the fact of such theft.

Some point is made that the testimony of the witnesses relative to the testimony of Jensen and Drew in the police court is not of much importance because there was no court reporter present to take down the testimony in the police court. Defendants did not object to the evidence upon that ground. Nor was a reporter necessary. It is well settled that contradictory statements of a witness at a former trial may be proved to impeach him by the testimony of any competent witness who heard them. 6 Dunnell, Minn. Dig. (2 ed.) § 10351, note 88.

If the fact were as claimed, that plaintiff was not corroborated, it would be of no importance. Corroboration of a party is not required in civil cases. But plaintiff was corroborated, as the evidence already stated shows.

Evidence is not belief-compelling or persuasive which is inconclusive, contradictory, and open to suspicion. It is the peculiar province of the jury to determine the weight of evidence without interference by the court. It seems to me that the decision in this case trespasses on the province of the jury to determine such questions.

There is evidence of actual malice to justify heavy damages within the rule stated in the majority opinion. Actual bias was shown by the insulting and abusive language applied by both Drew and Jensen to plaintiff and by the reckless disregard of her rights and the oppressive conduct toward her. When plaintiff contended that

she bought the goods she was told that she was dumb and crazy. When she offered to prove her innocence Drew declined to act upon her offers. The jury was justified in finding that Jensen and Drew acted wilfully and purposely, knowing that their conduct was wrong and unlawful. Such conduct is malicious. 4 Dunnell, Minn. Dig. (2 ed.) § 5734; Lammers v. Mason, 123 Minn. 204, 143 N. W. 359; Price v. Denison, 95 Minn. 106, 103 N. W. 728; Boyd v. Mendenhall, 53 Minn. 274, 55 N. W. 45.

While an admonition to trial judges may have been justified in 1885 when we decided Woodward v. Glidden, 33 Minn. 108, 22 N. W. 127, none seems necessary now. The prestige of courts has suffered not from a failure of judges to interfere with verdicts but from the belief that there has been too much interference, with the result that sentiment has crystallized in legislation curbing the power of courts with respect to finding the facts and extending the right of jury trial, as for example, under the Norris-LaGuardia Act [29 USCA, §§ 101-115] and state laws copied from it. In my judgment, the prestige of the courts will be enhanced by observing the restraints which the constitution and the laws place upon them in jury trials. Nor should the trial judge in this case be lectured. Did we not in Jones v. Flaherty, 139 Minn. 97, 165 N. W. 963, deny his plea as counsel to apply the rule of Woodward v. Glidden to a situation not distinguishable from that in the instant case? We ourselves in the cited case reduced a verdict from $1,125 to $600. Certainly we should not reproach the trial judge for applying the lesson painfully learned by him in the Flaherty case, which we ourselves, so to speak, taught him.

In my opinion, there is no error and the verdict should stand.