## IN RE ESTATE OF WILHELMINA SOUTH.
## BETHANY FELLOWSHIP, INC., v. GEORGE E. MURK
## AND OTHERS.[1]

February 4, 1955.

No. 36,426.

*Carl O. Wegner, Andrew G. Kohlan,* and *John Santee,* for appellants.

*Olaf R. Kelly,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying the alternative motion of objectors, George E. Murk, administrator of the estate of Wilhelmina South, deceased, and Mary Johnson, for amended findings of fact, conclusions of law, and order for judgment or a new trial.

---

[1]Reported in 68 N. W. (2d) 585.

Wilhelmina South died on February 28, 1951, in the city of Minneapolis. For many years she had lived alone in a five-room bungalow in Minneapolis which she owned. Her death followed an operation performed on the previous evening. She left an estate consisting of her homestead and some personal property. On March 6, 1951, Mary Johnson petitioned the probate court of Hennepin county to order the appointment of George E. Murk as special administrator of the estate of decedent. On March 8, 1951, the Reverend T. A. Hegre filed a petition in the probate court to prove the will of Wilhelmina South, and a hearing was ordered on the petition. Thereafter, objections to the allowance of the will were filed by Mary Johnson and others on March 29, 1951. On May 24, 1951, the probate court issued its order denying the admission of the will to probate and appointing George E. Murk as administrator. Proponent, Bethany Fellowship, Inc., thereafter appealed to the district court. At the trial of the matter in district court the following questions were submitted to a jury:

"Interrogatory No. 1. Did Wilhelmina South have testamentary capacity on the 27th day of February, 1951, at the time she signed her purported last will and testament * * *?"

The jury's answer was "Yes."

"Interrogatory No. 2. Was the purported will of Wilhelmina South procured by means of undue influence exerted upon her by or on behalf of Bethany Fellowship, Inc.?"

The jury's answer was "No."

The verdict of the jury was adopted by the district court, which court found that on February 27, 1951, at the time of the execution of her will, Wilhelmina South was of sound mind and memory and possessed testamentary capacity to execute a will; that the will was not procured or executed as the result of any undue influence exercised upon her by or on behalf of Bethany Fellowship, Inc., or by anyone else; that the will in all respects was duly and legally executed as required by law; that Mary Johnson was a daughter of decedent's maternal grandmother; and that, insofar as the action

in district court was concerned, she appeared to be the surviving next of kin of decedent. In its conclusions of law, the district court determined that the will was a valid and legal will and testament of decedent and entitled to admission to probate as her last will and testament and that the order of the probate court denying the admission of the will to probate and appointing an administrator should be reversed and judgment was ordered accordingly.

Objectors moved for an order for amended findings, conclusions of law, and order for judgment or a new trial, which was denied, and this appeal was taken from the denial of that motion.

It appears from the record that Bethany Chapel is an active incorporated religious congregation of which the Reverend T. A. Hegre is the pastor and that the congregation was formed in 1945. According to Mr. Hegre's testimony, decedent was a member of the congregation. Mr. Hegre also testified that Bethany Fellowship, Inc., is a religious educational institution located at 6820 Auto Club Road, Minneapolis, and that these corporations are separate, although members of the Chapel could be members of the Fellowship, and vice versa. According to him, Bethany Fellowship, Inc., trains its missionaries and religious workers and helps maintain them. He claims that decedent had been a sustaining member of Bethany Fellowship, Inc., since 1949 and that a sustaining member is one who contributes funds for the upkeep of the Fellowship. Its membership is divided into three classes; namely, staff members, sustaining members, and associate members. The governing body consists of the entire membership, of which Mr. Hegre is the president and his wife the dean of women. He also testified that decedent frequently attended meetings and visited at the Fellowship.

It further appears from the record that decedent became ill and that Mrs. Hegre took her to see some doctors, who apparently found nothing wrong. Mrs. Hegre testified that when decedent was living alone and was ill she did not prepare her food regularly and that Mrs. Hegre invited her to stay at Bethany Fellowship until she felt better, which invitation was accepted. Mrs. Hegre said that decedent was given a private room at the Fellowship where she had use of the

facilities of the home, including telephone, certain nursing care, and prepared food, and that she also had the opportunity of receiving visitors, all without charge on the part of the Fellowship. Mr. Hegre corroborated his wife's testimony in that respect. Miss South stayed at the Fellowship for a week, when she was taken to Minneapolis General Hospital for a more complete physical checkup. There was testimony that she entered the hospital on February 21, 1951. Mrs. Hegre testified that she and her husband visited decedent in the hospital on several occasions, and relatives also visited her.

It also appears from the record that Alice Lindquist and Florence Peterson, daughters of Mary Johnson, visited decedent at the hospital on Sunday, February 25, 1951, and that; according to their testimony, she told them that if anything happened to her she wanted to give $1,000 to her cousin in Norway, payable at the rate of $100 per month, $1,000 to Northwestern Bible School, something to Charles Fuller (radio missionary in California), and to have perpetual care given to an urn at Lakewood Cemetery.

At about 2:30 p. m. on February 27, 1951, Dr. William P. Sadler informed Miss South that she needed an operation. Later that day, about 4 p. m., Mr. and Mrs. Hegre visited her at the hospital. Mr. Hegre claims that they greeted her upon entering the room, that she looked at them both, and that she said: "I want to put it in writing." He said that he did not make any response to that remark but that he read some scriptures to her and prayed for her; that after doing this he asked her: "Is there anything now I can do for you?" and she said "Yes, I want you to put it in writing"; and that she then mentioned her will and said "I know what I want but it is not in writing and I understand a lawyer has to draw it up." Mr. Hegre said that he next asked her what she wanted, that she told him, and that he wrote down what she said. He then went on to testify that she had mentioned people, including William Murk, Mrs. Lindquist, Mrs. Peterson, and Mrs. Lovering, who she said had been there to see her. He was asked if Miss South had said anything about the Reverend William H. Murk concerning the will, and the witness replied that she said: "Mr. Murk is too busy so I want you to take care of this."

Mr. Hegre said that Miss South then told him what she wanted and that he wrote it down. He said that she informed him that she wanted her house to go for the use of the Fellowship, $1,000 to a cousin in Norway at the rate of $100 a year, an urn and perpetual upkeep for the urn at the cemetery, $500 to Northwestern Bible School, and $500 to Charles C. Fuller Broadcasting. He further claims that she wanted the rest of her property "to be used for the Lord's work under my direction." When asked if by that she meant the Fellowship, Mr. Hegre answered: "I presume she meant that, the Lord's work under my direction." When questioned as to whom she wanted to be named as executor, the witness answered: "She asked me to take care of everything." The witness said that it took about 20 minutes from the time he first entered the room that afternoon until Miss South had completed giving him details of the provisions of the will; that when this was done he told her of a Christian attorney and asked her if he should call him; and that she answered "yes." Mr. Hegre said that he gave her the name of Edward O. Serstock, who previously had done legal work for him over a period of about ten or twelve years and had acted as attorney in the incorporation of Bethany Fellowship, Inc.; that after doing this he went out into the corridor and telephoned Serstock; that while in the corridor he met Mrs. Lovering and Mrs. Peterson and told them that Miss South had given him the provisions for her will and that he was about to call an attorney; that, when informed that Miss South's operation was to be at five o'clock, he asked a nurse if it would be possible for it to be delayed; that he was informed that he would have to talk to the doctor about that but that they rarely were on time; that after the conversation with the ladies in the corridor he called the attorney on the telephone; and that from notes he had taken in his conversation with Miss South he asked the attorney "if he would draw it up [the will] and come over to the hospital as quickly as possible and that I would see the doctor and ask him if he could delay the operation so that he could get there before she went to the operating room." He was then asked:

"Q. What did he say?

"A. He said he would.

"Q. How long after that was it when Mr. Serstock came?

"A. I would say about forty-five minutes. It seemed awfully long to me, but perhaps wasn't."

Mr. Hegre claimed that he met Serstock in the hospital hall and brought him to the bedside of Miss South. It also appears that Mrs. Lovering, Mrs. Peterson, and Mrs. Hegre were standing at various places at or near the bedside, where they remained during the reading and execution of the will. After preliminary introductions, Mr. Hegre went toward the hallway, Mrs. Hegre took a position at the left side of the bed, and Mr. Serstock stood next to her near the center, and, according to Mr. Serstock, he handed the will which he had prepared to Miss South, who held it in her hands and apparently read it. Mr. Serstock testified that he then read the will aloud to her and discussed each provision with her and that she spelled out for him difficult names in the will. He said that he inquired as to her relatives and that she told him of the property she had. He further said that he did not observe anything to indicate any physical or mental disability but admitted that he met her for the first time when he brought the will to her bedside for execution. He claims that she signed the will unassisted. Serstock said that, before signing the will, he asked Miss South about an executor and that he mentioned to her that Mr. Hegre was named in the will in that capacity. He said that he then informed her that she could have anyone else but that she said she wanted Mr. Hegre. After the will was signed, a discussion took place to the effect that they would have to have two witnesses to her signature. The attorney said that he saw two ladies visiting with her; that he assumed that they were friends; and that he said something to the effect that perhaps one of them could serve as a witness. He later discovered that he was talking with Mrs. Lovering, who said "No, I won't sign unless I read the will." There was testimony that he also asked Mrs. Peterson to act as a witness and that she refused. The witness said that after this experience "I found out I was not among friends so I turned

around to Mrs. Hegre and I said, 'Perhaps we can get Mrs. Hegre to sign as a witness.' " He said that he then asked Miss South if it would be all right with her to have Mrs. Hegre sign with him as a witness and that her answer was "Yes, the two of you."

We have carefully examined the record in this matter, and, while there appear to be no irregularities in the way the attorney handled the matter under the circumstances, we are unable to determine the extent of the beneficial interest of the Reverend and Mrs. Hegre. Obviously, the objectors' case depends to a great extent on the weight of the testimony of the Hegres. It is fundamental that, if Mr. and Mrs. Hegre personally had been named as beneficiaries under the will, their testimony as to conversations with the deceased would not have been admissible. While it is true that the residence of decedent and the residue of her estate, after payment of debts, expenses of last illness and administration, and other bequests, go to Bethany Fellowship, Inc., rather than to Mr. and Mrs. Hegre individually, it is also apparent that they directly benefit materially from their association with Bethany Fellowship, Inc. Although it does not appear that they actually receive compensation for their services, they do receive their board and room and, directly or indirectly, their clothing. Mr. Hegre is president of Bethany Fellowship, Inc., and his wife is dean of the Bethany missionary training school conducted by the Fellowship. It is our opinion that, because of their close association with decedent for some time prior to her death and because of the activity on the part of the Reverend Hegre in the preparation of the will in which he was named as executor and Bethany Fellowship, Inc., was named as the principal beneficiary, in the interests of justice a new trial should be granted. It is apparent to us that upon a new trial clearer evidence could be produced as to the extent of the beneficial interest of the Hegres. A new trial may be granted in the interests of justice and where there is a possibility of stronger evidence on another trial. Parrish v. Peoples, 214 Minn. 589, 9 N. W. (2d) 225; 14 Dunnell, Dig. (3 ed.) §§ 7142 and 7143; Emerson v. Hennessy, 47 Minn. 461, 50 N. W. 603; Farmers State Bank v. Merchants & Mfrs. State Bank, 164 Minn.

300, 204 N. W. 965; Greengard v. Burton, 88 Minn. 252, 92 N. W. 931; Hallen v. Montgomery Ward & Co. Inc. 203 Minn. 349, 281 N. W. 291.

In deciding that a new trial should be granted here we are not overlooking our fundamental rules with reference to examining the evidence in the light most favorable to the prevailing party, findings of the trial court where there is conflicting evidence, and findings reasonably supported by the evidence. We realize that the evidence is conflicting here, especially as to the condition of decedent at or about the time she executed the will. There is medical testimony to the effect that on the afternoon of her operation she was critically ill; that she was having considerable difficulty in breathing, which was greatly accelerated; that her lungs were unable to be aerated; and that she was in a profound toxic condition. On the other hand, there is testimony that about this same time she was able to spell out very long Norwegian names in connection with a bequest which she was making to her cousin in Norway. There also seems to be some confusion with the bequest to her elderly cousin in Norway, inasmuch as there was testimony that the Sunday before she executed the will she indicated that she wanted that cousin to have $1,000 payable in monthly installments, while the will provided that the payments were to be made in annual $100 installments to a woman who, according to oral argument, was then about 90 years of age. While the emergency due to her operation in the late afternoon before her death might have necessitated the preparation of this will shortly before she entered the operating room, it is unfortunate that the one who was so actively engaged in assisting her in preparing this will was also directly interested in and president of the Fellowship which benefited most from her bequests.

For the reasons above stated a new trial should be granted.
Reversed.