### ROBERT MORRIS v. GREAT NORTHERN RAILWAY COMPANY.[1]

#### December 28, 1896.

#### Nos. 10,279—(146).

**Executed Contract—Insanity—Recovery—Disaffirmance—Release.**

Where an executed contract has been made in good faith, for a valuable consideration, and without notice of the insanity, with a person who is of unsound mind (but where there has been no inquisition and finding of lunacy), the latter must elect, within a reasonable time after regaining his mental capacity, whether he will affirm or disaffirm the contract; and, if he elects to do the latter, he must return the consideration which he has received. This rule is not changed by the fact that the contract was made and the consideration paid by a third person for the benefit of the other party. Rule applied to a settlement and release of a claim for personal injuries.

[1] Reported in 69 N. W. 628.

Appeal by defendant from an order of the district court for Ramsey county, Brill, J., denying a motion for a new trial, after a verdict in favor of plaintiff for $900. Reversed.

*C. Wellington*, for appellant.

*Frederick L. McGhee* and *Stevens, O'Brien, Cole & Albrecht*, for respondent.

MITCHELL, J. This was an action to recover damages for personal injuries caused by the alleged negligence of the defendant. The defendant, among other defenses, pleaded accord and satisfaction, and a release of the cause of action executed by the plaintiff June 12, 1893. The plaintiff, in reply, admitted that he signed such a release, but alleged that at the time of his doing so he was of unsound mind and understanding to such an extent that he did not know or appreciate the meaning, effect, or consequences of it, and that this fact was known to all parties for whose benefit the release was taken.

The plaintiff was in the employ of the Northern Pacific Railroad Company as cook on a business car which was on its way westward. The road of the Northern Pacific Company being obstructed, the car was attached to a train of the defendant, to be hauled over its road. On this trip, owing to a washout on defendant's track, the car was derailed, and the plaintiff sustained the injuries complained of. Plaintiff, thinking he had a claim on account of these injuries against one or both of the companies, employed A. B. Ovitt as his attorney to attend to the collection and enforcement of his claim. Ovitt having informed the claim agent of the Northern Pacific Company of plaintiff's claim, and of his own employment in the matter, the claim agent went to see the plaintiff, but the latter refused to negotiate in person, but referred the claim agent to Ovitt as his attorney, to whom he had intrusted the whole matter. Then followed negotiations between Ovitt and the claim agent, during which the former consulted his client more or less, which culminated in an agreement between the claim agent and Ovitt for a settlement of plaintiff's claim for $375.

It is not very apparent how any liability under any circumstance rested on the Northern Pacific Company, but presumably the reason why it assumed the liability, if any, was because the defendant was

hauling its car for its accommodation. But, however that may be, the terms of a settlement having been agreed on, Ovitt and the claim agent went to plaintiff's house, to close the matter, by having him execute a formal instrument of release, and by the claim agent paying over the money. They found plaintiff at home, and thereupon he executed an instrument releasing both railway companies in full, and the claim agent delivered to him a check for the $375, which plaintiff indorsed and delivered to his attorney, Ovitt, to draw the money on it. Plaintiff, being illiterate, signed the release and the indorsement on the check with his mark, his name being written in both instances by his attorney. We speak of these things as facts, because we do not understand plaintiff's testimony, especially in view of the admissions in his reply, as amounting to a denial that he signed the release, but as meaning simply that, owing to his demented condition at the time, he was unconscious of what he was doing, and hence has no memory on the subject. On the same or the next day Ovitt drew the money on the check, and, after deducting his own fees, deposited the balance in his own name in the Seven Corners Bank.

There is some evidence tending to show that some disagreement arose between plaintiff and Ovitt regarding the settlement, or as to the disposition of the money, but what the exact nature of it was does not clearly appear, but it is probably fairly inferable from the evidence that plaintiff subsequently refused to recognize the settlement, or accept the money from Ovitt; but anything that was done or said in that respect was not communicated to any one except his own attorney. On July 16, Ovitt notified defendant that the money was in the Seven Corners Bank subject to his order, and at his risk. Plaintiff never called for the money, and about August 1 the bank failed. Nothing further appears to have been done in the matter by plaintiff until he brought this action in the spring of 1894.

There is no evidence of any fraud or bad faith on the part of the claim agent of the Northern Pacific Railroad Company who made this settlement, or that he or either of the railroad companies, for whose benefit it was made, had any notice or knowledge of plaintiff's mental incapacity, if any such existed. On the contrary, in view of the doubt that might exist as to whether either company was liable, and the uncertainty existing at that time as to whether plaintiff's in-

juries were either serious or permanent, so far as appears, the settlement was a liberal one on part of the railroad companies, and a judicious one for Ovitt to make in behalf of his client.

Upon this state of facts we find it unnecessary to consider many of the questions discussed by counsel,—as, for example, whether the defendant bore to plaintiff the relation of common carrier, whether the accident raised a presumption of negligence on part of the defendant, and, if so, whether that presumption was conclusively rebutted by the evidence. The evidence as to plaintiff's mental condition presents a rather remarkable case. It does not appear that this insanity had existed, to any marked degree, at least, before this day, or that it continued for any considerable time afterwards. It would seem as if just one day had entirely dropped out of plaintiff's mental consciousness, and by a remarkable coincidence that day happened to be the one on which he signed this release. But such a thing is possible, and the evidence as to his mental condition on that day undoubtedly made a case for the jury.

But, conceding plaintiff's mental incapacity on that day, there is an insuperable obstacle to his recovery in the fact that he has never rescinded, nor offered to rescind, the settlement, but still retains the consideration, and has never offered to return it. He having never been adjudged insane by a court of competent jurisdiction, his contract was not void, but at most merely voidable, at his election. There is no pretense that his mental incapacity continued for any considerable time after the release was executed. Upon recovering his usual mental condition, it was his duty to elect promptly—that is, within a reasonable time—whether he would affirm or disaffirm, and, if he elected to do the latter, it was his duty to restore or offer to restore what he had received, so as to place the parties in statu quo. He cannot affirm in part and reject in part. He cannot escape the burdens of the contract and retain its benefits. Of course, we have no reference to cases where the other party has been guilty of fraud or bad faith in procuring the contract, and the insane person has lost or squandered the consideration before he regained his mental capacity. But the rule is well established that, where an executed contract has been made in good faith, for a valuable consideration, and without knowledge of the insanity (and before office found), the consideration must be returned so as to place the other party in

statu quo before the contract will be avoided. This rule is peculiarly applicable to a case like the present.

The liability of these railroad companies, or either of them, was a disputed or doubtful question. They may not have been, in law, liable at all to the plaintiff. A sum of money is paid to him to settle this disputed or doubtful question. To permit plaintiff to repudiate the settlement and maintain this action without returning or offering to return what he has received, would be to allow him to take his chances of recovering in this action without running the risk of losing what he has received in case he is defeated. The language of Justice Shiras in Vandervelden v. Chicago & N. W. R. Co., 61 Fed. 54, is particularly in point. See, also, Schaps v. Lehner, 54 Minn. 208, 55 N. W. 911; Eaton v. Eaton, 37 N. J. Law, 108; Arnold v. Richmond Iron Works, 1 Gray, 434; Gould v. Cayuga C. N. Bank, 86 N. Y. 75.

It is suggested, however, that plaintiff has never accepted the money, and that it has never come into his hands. The check was delivered to him, and was turned over to his attorney, who did obtain the money on it; and if, by reason of any acts of his attorney, or the failure of the bank in which it was deposited, the plaintiff has lost the money, that is his misfortune, but it cannot change the law of the case.

Finally, it is contended that the money was paid by the Northern Pacific Railroad Company, and not by the defendant, and hence that plaintiff owes no duty to refund anything to the defendant. This contention is entirely fallacious. The settlement was made and the money paid by the Northern Pacific Company for the benefit of the defendant, and, if plaintiff wished to rescind, it was his duty to restore what he had received to the Northern Pacific Company. The fact that the consideration was paid for the benefit of the defendant by a third party does not render it any less plaintiff's duty to refund, or give him any right to retain the consideration, and at the same time repudiate the release of defendant for which that consideration was paid.

A case like the present must be distinguished from one where a party has secured a release in form under the false or fraudulent pretext that it was something else; as, for example, a receipt for money paid as a gratuity. In such case there is nothing to rescind. The

other party may retain the gift, and sue for his damages. And assuming that plaintiff was at the time unconscious of the fact that he was signing a release, there is no evidence that he did not shortly afterwards regain his normal mental condition, and become aware of the nature of the contract which he had executed. It then became his duty to elect promptly whether he would affirm or rescind.

Order reversed.