# JERRY ROGERS v. CENTRAL LAND & INVESTMENT COMPANY.[1]

July 1, 1921.

No. 22,220.

**Findings not supported by evidence.**

1. The evidence fails to sustain the finding that defendant fraudulently misrepresented the value of the land, or the finding that plaintiff lacked mental capacity to make the contract in controversy.

**Contract by incompetent — evidence required.**

2. To establish that a person lacked mental capacity to make a contract, it must appear that he was unable to comprehend, to a reasonable extent, the nature and effect of the contract.

After the former appeal reported in 140 Minn. 295, 168 N. W. 16, the case was tried before Giddings, J., who when plaintiff rested denied defendant's motion to dismiss the action, and submitted to the jury the special questions mentioned in the third paragraph of the opinion, made findings and ordered judgment in favor of plaintiff as stated in the opinion. From an order denying its motion for a new trial, defendant appealed. Reversed.

*R. B. Brower* and *S. A. Johnson,* for appellant.

*M. A. Hessian* and *Roberts & Strong,* for respondent.

TAYLOR, C.

This is an action to rescind a contract for the purchase of a section of land in Luce county, Michigan. It has been tried twice. At the first trial, the court submitted special questions to a jury covering the two claims of fraud then urged, namely, that defendant's agent had falsely represented that the land was "cut over" land, and that it was of the value of $25 per acre. The jury answered these questions in favor of the plaintiff. The court incorporated the conclusions of the jury in

1Reported in 183 N. W. 961.

its findings of fact and directed judgment for plaintiff. On appeal, this court held that the findings were not sustained by the evidence and granted a new trial. Rogers v. Central Land & Inv. Co. 140 Minn. 295, 168 N. W. 16. A more complete statement of the facts will be found in that opinion.

Before the second trial plaintiff amended his complaint by inserting allegations to the effect that he had been addicted to the excessive use of intoxicating liquors for many years, and by reason thereof was not mentally competent to make the contract; that the contract was an improvident one, for the reason that he did not possess the financial resources necessary to enable him to make the deferred payments, and that defendant and its agents, for the purpose of defrauding him, took advantage of his weakened mental condition to induce him to make what they knew was an improvident contract. The amendment also contained an allegation to the effect that defendant's agents plied him with liquor and induced him to execute the contract while intoxicated, but the testimony showed that his charge was wholly unfounded and it was abandoned.

At the second trial, the court again submitted to a jury special questions covering the two claims relied upon at this trial, namely, the claim that defendant's agent had falsely represented the land to be of the value of $25 per acre, and the claim that plaintiff was mentally incompetent to make the contract and that defendant's agent had taken undue advantage of his condition to induce him to make it. The jury answered these questions in favor of the plaintiff. The court incorporated the conclusions of the jury in its findings and directed judgment for plaintiff. Defendant moved for a new trial and appeals from the order denying it.

On the former appeal, it was held that the former decision could not be sustained on the ground of false representations as to value. Neither can the present decision be sustained on that ground. While the evidence is not the same as at the first trial, it fails to show any representations which would bring the case within the exceptions to the general rule that statements of value do not constitute actionable fraud. It appears from the cross-examination of plaintiff that this claim of fraud rests on the fact that he was told that the selling price of the

land was $25 per acre and that he would have to pay that price for it. This statement furnished no basis for a claim of fraud. This was the selling price which defendant had placed on the land and the same price at which it made sales to others of similar land in the same vicinity. Plaintiff presented evidence tending to show that $25 per acre was much more than the land was worth, but failed to show that defendant's agent had made any representations as to value, except to state the selling price fixed by defendant. An examination of the record fails to disclose any false statements or representations of any sort, and no other claim of misrepresentation is now urged.

Plaintiff's attorneys argue with force and earnestness that the evidence is sufficient to sustain the finding that plaintiff was not mentally competent to make such a contract, but concede that this finding is not in accord with plaintiff's own opinion as expressed in his testimony.

The contract in controversy bears date July 10, 1915. Plaintiff was then about 58 years of age and unmarried. He was illiterate; was only able to read a little and write his name. He had been raised on a farm and had lived in Wright county over 40 years and owned 80 acres of land in that county which had been conveyed to him by his father. He had been a heavy drinker for many years, but had taken a liquor cure in May and June preceding the making of the contract and was not drinking to a harmful extent at that time. During all his lifetime, after reaching the age of maturity, he had conducted his own business affairs without any suggestion that he was not fully competent to do so. After his father's death he had settled his father's estate and his father's debts. There had been litigation between him and his brothers concerning his father's estate, and his brothers had also prosecuted an action against him to set aside the deed from his father to the 80 acres of land. He had conducted his side of this litigation and it had resulted in his favor. He had bought 40 acres of land, borrowing the money to make the initial payment, and had farmed it for some years and had then sold it, apparently at a profit. The evidence is to the effect that in his business dealings he exhibited considerable shrewdness, but that, aside from the matters above mentioned, his prior business dealings had not involved transactions of any considerable moment.

He had been informed that his brothers contemplated bringing an-

other action for the purpose of getting his land away from him.    In discussing this matter with a friend, the advisability of selling the land to avoid further trouble was suggested, and he concluded to dispose of it. Shortly before this, plaintiff had become acquainted with J. J. Hicks and John M. Charlton, who stopped for a few days at the hotel in Waverly where plaintiff seems to have been staying.   Hicks was defendant's agent for the sale of its lands, and had made an arrangement with Charlton, by which Charlton was to receive a part of the commission on any sales made to purchasers produced by Charlton.   Plaintiff knew that Hicks and Charlton were selling Michigan lands, but states that they said nothing to him concerning these lands.   After Hicks had left Waverly, plaintiff had a conversation with Charlton, in which he told Charlton of the threatened lawsuit and discussed the matter of exchanging the 80 for Michigan land.   Charlton could not make such a deal, and told plaintiff it would be necessary to see Hicks and promised to do so.   They knew that Hicks had arranged to take a party of landseekers from St. Paul to the land, and, as a result of his talk with Charlton, plaintiff joined this party at St. Paul and went to Michigan to examine the land.   Plaintiff had no talk with Hicks in reference to making a purchase until they had examined some of the land owned by the company.   The following is an excerpt from his testimony on cross-examination concerning this talk with Hicks:

"Q. I believe you stated that Hicks then made the remark that if he thought you were going up there to work the place or to live on the place he would not make any deal with you at all? A. Yes, sir; he made that remark.   Q. That it was no place for you?   A. Yes, sir. Q. And as a matter of fact you told Hicks before that that it was your intention in making the exchange for this land, if you made the deal, to sell as much as you could of the land that you got in exchange, didn't you?   A. Well, something like that.   That he would sell it or help me to sell it.   Q. You told Hicks at that time that you could sell that land, didn't you?   A. At that time I did, and I thought I could, yes. Q. And you told him at that time you had friends around in your home country you thought would be interested in this land and that you felt sure that you could sell it and get some of them to buy some of this land?   A. Well, yes.   Q. And you thought you could, didn't you?   A.

Yes, sir. Q. And that is what you told Hicks? A. Well, something like that."

On their return to Waverly the contract was executed. Plaintiff took the section at $25 per acre amounting to $16,000; defendant took the 80 at $100 per acre amounting to $8,000, the price placed on it by plaintiff. The 80 was encumbered by mortgages which defendant assumed and subsequently paid. Plaintiff's interest in the 80 in the sum of $5,500 was applied as the first payment on the purchase price of the section. The remainder of the purchase price was divided into 15 annual payments of $700 each with interest payable annually. To give plaintiff an opportunity to make sales before the deferred payments became due, the first of these deferred instalments was made payable five years from the date of the contract. A subsequent instalment became due each year thereafter. Plaintiff tried to find purchasers for the land, but did not succeed in making any sales and abandoned the attempt.

The two witnesses, whose testimony is relied upon to sustain the finding that plaintiff was not mentally competent to make the contract, made no attempt to point out any instance, during the 30 years or more that they had known him, in which he had failed to exercise ordinary business sagacity in looking out for and protecting his own interests. They merely answered the question, whether, in their opinion, plaintiff had "mental capacity sufficient to look after and to take care of his interest in a transaction of the kind" here involved, in the negative. One of them expressed his idea of plaintiff's capacity in these words: "Well, I would say that in a general way he was a man of average capacity, but in a business way I would say that he was below the average man." The idea of the other, so far as expressed, is shown by the following excerpt from his testimony. "Q. He had the ordinary average ability, did he not? A. Well, no, I wouldn't say that. I don't think he has. Q. Well, would you say that he was below the ordinary individual in that respect? A. I would not like to answer that question. Q. Then your opinion is that he was of ordinary average ability, is that your opinion? A. Well, not that either." Neither of these witnesses were experts and their opinions were based largely, if not wholly, on the fact that plaintiff had been a hard drinker. They

nowhere state that he had any mental affliction or infirmity, or lacked sufficient ability to transact ordinary business. They were doubtless unconsciously influenced in their opinion by the fact that the present venture turned out unprofitably.

The rule to be applied in determining whether a contract may be avoided for lack of mental capacity to make it, as deduced from the prior decisions of this court, is stated in 1 Dunnell, Minn. Dig. § 1731, thus: "Mere mental weakness. does not incapacitate a person from contracting. It is sufficient if he has enough mental capacity to understand, to a reasonable extent, the nature and effect of what he is doing." This is the rule applied generally. 16 Am. & Eng. Enc. (2d ed.) 624; 22 Cyc. 1206; 14 R. C. L. 590.

The evidence is clearly insufficient to sustain a finding of incompetency within this rule, or to charge defendant's agent with any wrongdoing. Really the only basis for the claim of incompetency is the fact that plaintiff made an improvident contract for a man in his situation. But, as said by another court, the making of an improvident contract is not sufficient in itself to show lack of capacity to make contracts. If this were so, the number of incompetents would be legion.

Order reversed.

Brown, C. J. (dissenting).

In my view of the record the questions whether plaintiff had sufficient mental capacity to understand and comprehend the transaction complained of, and whether inequitable advantage was not derived therefrom by defendant, were issues of fact and properly submitted to the jury. The verdict given in answer to both questions, favorable to plaintiff, is not as I read the record manifestly against the evidence, within the rule guiding this court in such cases, and should not be disturbed.

Hallam, J. (dissenting).

I agree with the Chief Justice.