ALICE M. PARRISH, INCOMPETENT, BY JOHN D. NELSON,
HER LEGAL GUARDIAN, v. WILLIAM F. PEOPLES
AND ANOTHER.[1]

April 2, 1943.

No. 33,392.

[1]Reported in 9 N. W. (2d) 225.

*Ernest Malmberg,* for appellant.

*Reuder & Carroll* and *Henderson, Schwartz & Halpern,* for respondents.

YOUNGDAHL, JUSTICE.

This is an action by the guardian of Alice M. Parrish to cancel a deed executed by her prior to the adjudication of her incompetency. In the court below findings were made for defendants. Plaintiff moved for amended findings or a new trial, and appeals from the order denying the motion.

On December 3, 1941, Mrs. Parrish, by warranty deed, conveyed to defendants, husband and wife, as joint tenants, certain real property for a consideration of $800. This conveyance contained approximately eight acres and was a portion of the farm on which Mrs. Parrish lived and which she and her husband, Carl Parrish, had owned as joint tenants prior to his death on November 22, 1940. The purchase price was represented by a cash down payment of $240, and the balance was evidenced by an unsecured promissory note.

The negotiations which finally led up to the sale of this property were begun in November 1941. A contract was executed by Mrs. Parrish whereby she listed her property for sale exclusively with Mr. Peoples at a price of $1,000, less a commission of $100 to him. Peoples was then and had been for some time in the real estate and contracting business. Then followed numerous conferences and discussions regarding the sale of the property. Apparently Mrs. Parrish was eager to dispose of the property. Peoples communicated with certain prospective purchasers whom he thought might buy but was unsuccessful in making a sale. It was then proposed that Peoples himself purchase it. To this he agreed, for a consideration of $800. Mrs. Parrish engaged one Berscheid to make a survey. He went to the Parrish farm for this purpose, and after Mrs. Parrish's son designated the property to be sold he prepared a plat thereof. The most southerly line of the property, as reflected by the plat, was not straight, and at Peoples' request

the surveyor revised the plat, straightened the south boundary, and by doing so included some additional land not in the original survey. Mrs. Parrish, however, signed the plat as revised, and the conveyance was thereafter executed accordingly.

On March 6, 1942, upon the petition of Mrs. Parrish, the probate court of Hennepin county adjudged Mrs. Parrish an incompetent, and a guardian was appointed in her behalf.

This action to cancel the deed in question was begun shortly thereafter.

Plaintiff's assignments of error involve the consideration of four issues, namely:

(1) That defendants falsely and fraudulently made certain representations as to the value and quantity of the property conveyed.

(2) That the consideration for the deed was insufficient.

(3) That defendants exerted undue influence over plaintiff in the execution of the deed.

(4) That plaintiff was incompetent at the time of the transaction to manage her own business affairs.

■ Plaintiff has not properly pleaded fraud. In pleading fraud, the material facts constituting the fraud must be specifically alleged. A general charge of fraud is unavailing. Plaintiff's charge of fraud is general and therein fails to meet this requirement of pleading. 3 Dunnell, Dig. & Supp. § 3836, and cases cited. Nor was fraud proved. Fraud is not presumed but must be affirmatively proved. One who alleges fraud has the burden of proof and carries this burden throughout the trial. The evidence reasonably supports the court's finding that there was no fraud. *Id.* § 3837.

■ Although there was great disparity in the testimony on value and strong support in the evidence that the land conveyed was worth considerably more than the price for which it was sold, we believe that on the record before us the issue of sufficiency of consideration was properly a fact question for the lower court to determine. Having been decided adversely to plaintiff, we cannot

disturb the finding on review unless such finding is palpably contrary to the evidence. 1 Dunnell, Dig. & Supp. § 411.

■ Plaintiff likewise had the burden of proving undue influence in connection with the execution of the deed. The court found that there was no undue influence exerted, and the evidence supports this finding. 6 Dunnell, Dig. & Supp. § 9950.

■ In considering the contention of plaintiff that the evidence does not reasonably support the finding of competency, we are at the outset confronted with the rule that on appeal the testimony must be considered in the light most favorable to the prevailing party. Giving defendants the benefit of this rule, we must determine whether the court's finding that Mrs. Parrish was competent at the time of the execution of the deed is reasonably supported by the testimony. The evidence reveals that she was 47 years of age, the mother of 14 children, and that prior to the death of her husband had transacted little, if any, business. She had been confined to a life of simple domesticity and depended exclusively upon her husband to make decisions in business matters. Shortly after his death in 1940, she sold four or five acres of her farm land, contiguous to the property now in litigation, for a consideration of $1,700. The defendants, less than a year later, purchased nearly eight acres of comparable property from her for $800. The two realty experts, testifying for defendants, placed a maximum value of $900 and $1,000, respectively, on the property. One expert, however, admitted that no stakes or iron monuments were pointed out to him when he viewed the property for appraisal purposes. His testimony was very vague as to the location of the property lines, and he admitted that he relied entirely upon information given to him by defendant William F. Peoples as to what piece of property it was. In behalf of plaintiff, the Orono township assessor testified that the assessed valuation of the property for tax purposes was $1,800. Sam W. Batson, a real estate dealer in Hennepin county for 20 years, placed its value at $2,500. Kenneth Bollum, cashier of the State Bank of Long Lake since 1914, placed the value at $400 to $500 an acre.

Although the evidence on value was a fact question on the issue of sufficiency of consideration, which, having been determined adversely to appellant, cannot be disturbed on review, it is proper to be considered here insofar as it bears upon the question of Mrs. Parrish's competency to execute the deed complained of.

The only opinion evidence on the issue of competency is that of Kenneth Bollum. Because of his long acquaintance with Mrs. Parrish and her family, he was well qualified to state his opinion from personal knowledge regarding her competency to transact business. His assertion was positive that she was incompetent to take care of her own affairs. This testimony is not controverted, either directly or by inference from other facts and circumstances. In fact, considering her own testimony and the evidence as a whole, there is a strong supporting inference of incompetency. It is true, Bollum stated on cross-examination that the reason for his opinion was the fact that money passed through her hands too freely. This reason may not of itself be an adequate basis for establishing incompetency, yet it was a layman's manner of expressing himself on the issue. More accurately expressive, we believe, is his statement with reference to inquiries made by Mrs. Parrish while at the bank as to whether or not she should purchase certain stock for her farm. He stated that these were not "intelligent, purposeful inquiries." While the cross-examination of Bollum indicated that the basis for his opinion was not as satisfactory as it should be, the fact is that he, a credible witness, a banker of many years' experience and long-time resident in the community, gave positive and unrefuted testimony that in his opinion Mrs. Parrish was incompetent to transact business. We do not believe the trial court was at liberty to disregard this testimony. When interrogated by the court regarding this transaction, Mrs. Parrish was unresponsive and her replies vague and rambling. She obviously failed to grasp the import of the court's questions relating to the boundary lines of the property sold and appeared to attach no importance to the fact that she did not know the location of the south line thereof. Emphasized through

repetition was her one remark that she thought she was selling three acres only. We believe this interrogation tended to corroborate rather than impeach the opinion of witness Bollum as to competency.

Mrs. Parrish was paid $240 in cash, from which was deducted the expense of the survey and abstracting. The balance of the purchase price was evidenced by an unsecured promissory note in the sum of $560, payable in installments at the rate of $20 per month, executed by defendant William F. Peoples only. The deed, however, conveyed the property to defendants, husband and wife, as joint tenants. The note contained a provision that in the event it was fully paid by May 1, 1944, interest thereon would be waived. Significant, too, is the fact that Peoples himself testified that as an inducement to him to purchase the property Mrs. Parrish agreed to waive all interest on the note if paid by May or June 1942. Under the express provisions of the note, the principal would have been completely paid on May 1, 1944, the due date for the last installment payment. To sign such a note so charitably waiving the interest is a strong indication of failure on Mrs. Parrish's part to understand the nature of a common business transaction.

Another disquieting factor is the evidence regarding the straightening of the south line of the survey. When the surveyor came out to the farm one of the Parrish boys took him over to the property and pointed out the land to be surveyed. He then made a plat of the property and prepared a legal description. This he turned over to Peoples, calling his attention to the fact that the most southerly line was not straight. Peoples then requested the surveyor to straighten the line, the effect of which was to include therein additional property not in the original survey. The surveyor testified that he had no conversation with Mrs. Parrish regarding the line but acted at Peoples' request. He straightened the line, and the plat, as revised, was presented to Mrs. Parrish for her signature. She wrote this statement beneath the plat: "This is the land that Mrs. Alice Parrish is selling to F. Peoples."

She testified that she had no information about straightening the south line and was unaware of it when she signed the plat. It was Peoples himself who ordered the surveyor to make the revision, and admitted is the fact that there was no consideration for adding the extra piece of property included therein by the surveyor's revision of the south line. Though it be assumed, *arguendo*, that Mrs. Parrish understood the effect of signing the revised plat, the fact that she again became a benefactor by conveying, without consideration, this additional piece of property throws considerable doubt upon her competency to conduct ordinary business affairs.

We are not unmindful that this court has held that mere mental weakness does not incapacitate a person from contracting. It is sufficient if he has enough capacity to understand to a reasonable extent the nature and effect of what he is doing. 2 Dunnell, Dig. & Supp. § 1731; Rogers v. Central L. & I. Co. 149 Minn. 347, 183 N. W. 961, and other cases there cited. We are of the opinion that the evidence herein disclosed is such as to create considerable doubt as to whether Mrs. Parrish had such capacity.

A court of equity guards with jealous care all contracts or transactions with persons of unsound mind. 3 Dunnell, Dig. & Supp. § 4522; Lundberg v. Davidson, 72 Minn. 49, 74 N. W. 1018. In Schultz v. Oldenburg, 202 Minn. 237, 245, 277 N. W. 918, 922, this court said:

"From what has been said in prior cases it is clear that what the law aims to do is to protect the property and estate of one who is in fact incapable of doing so for himself. But his incapacity cannot be changed from a shield of protection to a rapier of offense."

The question of whether a person is incompetent by reason of mental disability so as to require the appointment of a guardian of his estate is not subject to demonstrable proof, but his mental disability is in the final analysis a matter of opinion, which must be based upon his conduct, actions, and statements in connection

with surrounding circumstances and conditions. Annotation, 113 A. L. R. 354; Schultz v. Oldenburg, *supra*. In Keiser v. Keiser, 113 Neb. 645, 651, 204 N. W. 394, 396, the court defines competency as follows:

"The descriptive words, 'mentally incompetent,' 'incompetent,' and 'incapable,' as used in sections 1589, 1590, Comp. St. 1922, mean any one who, though not insane, is, by reason of old age, disease, weakness of mind, or from any other cause or causes, unable' or incapable, unassisted, of properly taking care of himself or managing his property, and by reason thereof would be liable to be deceived or imposed upon by artful or designing persons. Mental incompetency or incapacity is established when there is found to exist an essential privation of reasoning faculties, or when a person is incapable of understanding and acting with discretion in the ordinary affairs of life. Where a person has insufficient mental capacity for the just protection of his property and his mental condition is such that he is guided by the will of others instead of his own in its disposition, a guardian should be appointed."

The Nebraska court in the Keiser case approved the rule laid down in Leatherman v. Leatherman, 82 W. Va. 748, 97 S. E. 294, to the effect that the test of mental capacity applied in suits for appointment of guardians should also be applied in those to avoid deeds and wills. In the Leatherman case the court said (82 W. Va. 750, 97 S. E. 295):

"In determining whether or not a person is of such unsound mind as would entitle a court to take from him the right of personal freedom and the right to manage and dispose of his own property, we know of no other test than the one which has often been applied by this court and courts of other jurisdictions in suits to avoid wills and deeds on the ground of alleged incompetency of the testator or grantor. The authorities do not undertake to prescribe the degree of mental acumen necessary to enable a person to make a deed or a will. But they all seem to agree

that, if grantor or testator knows and understands the nature and effect of his act, he has sufficient capacity to enable him to dispose of his property."

Applying the foregoing test to the facts in the instant case, though the evidence is not as satisfactory as it should be, there is such a doubt in our minds as to the competency of plaintiff that we feel a new trial should be granted on this issue in the interests of justice. While it is true that a new trial should not be granted if the findings are reasonably supported by the evidence, it is also true that findings contrary to uncontradicted and not inherently improbable testimony cannot be sustained. Gustafson v. N. W. Reed & Fibre Co. 180 Minn. 338, 230 N. W. 795. A new trial may be granted in the interests of justice and where there is a likely probability of stronger evidence on another trial. 5 Dunnell, Dig. & Supp. §§ 7142 and 7143; Emerson v. Hennessy, 47 Minn. 461, 50 N. W. 603; Farmers State Bank v. Merchants & Mfrs. State Bank, 164 Minn. 300, 204 N. W. 965; Greengard v. Burton, 88 Minn. 252, 92 N. W. 931; Hallen v. Montgomery Ward & Co. Inc. 203 Minn. 349, 281 N. W. 291.

Considering the length of time Mrs. Parrish has lived in the community, it should not be difficult to procure ample testimony on the issue of competency for the guidance of the trier of fact. It may well be that another trial will produce the same result on this issue. If so, we will be assured of the fact that the question was determined upon proper evidence and that this woman of questionable competency will have received the protection which the law adequately should provide for her.

There is a defect in the title to the action. Plaintiff should have been designated, "Alice M. Parrish, by John D. Nelson, her legal guardian." 3 Dunnell, Dig. §§ 4453 and 4332; Richardson v. Kotek, 123 Minn. 360, 143 N. W. 973; Johnson v. Colp, 211 Minn. 245, 300 N. W. 791. We have amended the title to conform with this rule.

The order of the lower court denying plaintiff's motion for a

new trial is reversed with directions that a new trial be granted only on the issue of competency.

JULIUS J. OLSON, JUSTICE (dissenting).

As a court of review, we are governed by certain well-established and time-honored rules. The one applicable here is that where an action is tried by the court without a jury its findings are entitled to the same weight as the verdict of a jury. We do not reverse unless the findings are contrary to the evidence. In many of our cases we have said that we do not reverse unless the findings are "manifestly and palpably" contrary to the evidence. This rule applies whether the appeal is from a judgment or from an order, and it is applicable whether the evidence is oral or documentary. 1 Dunnell, Dig. & Supp. § 411, and cases under notes 12 and 13. This thought, so well expressed by Mr. Justice Jaggard in N. W. Fire & Marine Ins. Co. v. Connecticut F. Ins. Co. 105 Minn. 483, 487, 117 N. W. 825, 826, is worthy of quotation here:

"This court, a court for the correction of errors, is here called upon to apply these rules of law to the facts proven, with due reference to the usual presumption in favor of the trial court, not only in determining the disputed questions of fact, but in drawing reasonable inferences from undisputed facts."

The present case was tried by the court. The issues of fraud, inadequate consideration, undue influence, and mental incompetency were all decided adversely to plaintiff's contentions. With the conclusion reached by the majority as to the first three, we can and should readily agree, namely: (1) That plaintiff has not properly pleaded nor proved fraud; (2) that the consideration for the deed may not be disturbed, since the findings made find evidentiary support; and (3) that plaintiff's proof of any undue influence is insufficient to sustain any such finding.

It is the fourth subdivision of the majority opinion with which I cannot agree. In my discussion of the evidence reference will be made to the settled case by indicating in parentheses the let-

ters *S. C.*, followed by the page from which the quoted testimony is taken. Thus there will be the testimony as given rather than my own inferences drawn therefrom.

First to be considered is the testimony of banker Bollum, upon which the majority heavily relies. After testifying to the value of the involved property, he was asked about his acquaintance with Mrs. Parrish, which he estimated to be "about 20 or 25 years" (S. C. 33). Upon examination by Mr. Malmberg, counsel for plaintiff, he testified:

"Q. About how often would you say you have seen her in the bank in connection with business transactions?

"A. Well, not very many times. More often since her husband died.

"Q. How many times would you say since her husband died?

"A. Well, this spring [1942] she has been in quite a number of times, probably once a week.

"Q. For what purposes?

"A. She has had some checks, and some other business she has asked me about.

"Q. Was that conversation you had in connection with business transactions?

"A. Yes, most of it was.

"Q. And from your observation of her in in connection with these conversations have you an opinion as to her competency to transact business?

"A. Yes.

"Q. And what is that opinion?

[There was an objection of "no proper foundation laid," but it was overruled.]

"A. Well, I don't feel she is competent to take care of her own business."

On cross-examination he testified (S. C. 35):

"Q. Did she ever come in and make a request for a loan of money for the purpose of buying a cow or horse?

"A. Yes, she did.

"Q. And it was in connection with a request for money she came in and asked for advice in connection with buying a cow or horse, or some animal necessary for her farm?

"A. Yes.

"Q. All these inquiries were intelligent, purposeful inquiries, weren't they?

"A. *Well, I don't know; I wouldn't say they were.*" (Italics supplied.) (The majority construes this to mean "that these were not 'intelligent, purposeful inquiries.'" I cannot so construe it, but let the record [S. C. 37] speak for itself.)

"Q. Why, then, do you say in your opinion she is not competent to transact business?

"A. Because I think when she gets a few dollars it passes through her hands very fast.

\* \* \* \* \*

"Q. Anything else?

"A. Well, I don't think she understands the value of money for one thing; I told her that when she sold that property for that amount of money." (What the witness referred to was Mrs. Parrish's sale to defendants of the land involved in this litigation.)

What has been quoted is the sole basis upon which plaintiff relies to show lack of competency by direct testimony. Mr. Bollum spoke as a layman and based his opinion solely upon what he had observed in his business relations with Mrs. Parrish. Lack of ability to hang onto money is the test which to his mind was the controlling factor in reaching the conclusion that "I don't feel she is competent to take care of her own business." The majority say "this testimony is not controverted." How could it be, since, in the very nature of things, no one could "controvert" his own state of mind. That result necessarily followed, because "a witness not an expert must first disclose the facts upon which his opinion is based, before he can be allowed to express an opinion on mental capacity, and then can be allowed to state only his

opinion formed *from those facts."* (Italics supplied.) In re Will of Pinney, 27 Minn. 280, 281, 6 N. W. 791, 792, 7 N. W. 144.

Next, it is said that, while the lower court was justified in finding that there was no lack of adequate consideration, yet, since there was such wide discrepancy in the testimony on that issue, therefore this court should now consider the same as having a substantial bearing upon the mental capacity of Mrs. Parrish when she made this deal. Obviously, the question of value of the property was primarily for the trial court to determine. Its findings, the majority rightly concludes, are supported by the evidence. This being so, what right has this court again to rehash that issue? The trial judge had before him all the witnesses and the parties to the cause. He had the opportunity of observing them, of judging the weight to be given to their testimony, to observe their attitude and demeanor while testifying, to ascertain the interest or lack thereof each had in the outcome, whether he was a partisan or an advocate for either side, or whether he was fair and honestly stated the facts of which he had knowledge. These are opportunities and advantages denied to an appellate court. What we know is derived solely from the record. These are cogent reasons for the adoption of and adherence to the rule that the findings of the trial judge are entitled to the same weight as the verdict of a jury.

The testimony of Mrs. Parrish is interesting. It furnishes some light by means of which the trier of fact could well reach the conclusion that she was not a mental incompetent when this deal was made. She testified that Mr. Peoples came to her place and wanted to buy this property (S. C. 6, 7).

"Q. Did he say anything to you about the number of acres he wanted to buy?

\* \* \* \* \*

"A. Why, he said he would like about three acres, *or that piece.* So then I went up there and we looked around, Kenneth and I did. And I says, 'Well, to the best of my knowledge I think there is about three acres in there.' Then he told me a bunch of colored

people were going to go together and buy *that piece.* So then I said, 'All right.' And he said, 'I want to know how much you want for it.' And I told him I would like a thousand dollars for it. And he says that would be all right; they would all go together and buy it." (Italics supplied.)

Then follows some testimony with regard to the selection of a surveyor. Her counsel then proceeded as follows (S. C. 8, 9):

"Q. Before that, Mrs. Parrish, you said in the first conversation you asked a thousand dollars for it?

"A. Yes, I did.

"Q. Did he pay you a thousand dollars for it finally, or agree to pay you a thousand dollars for it?

"A. Well, he said he would pay a thousand dollars providing the rest went in with him; that would be the understanding, that it was to be more people in it.

"Q. How did you come to sell it for $800?

"A. Well, because Mr. Peoples came up and he said the rest of them had backed out and he couldn't afford to pay any more than $800 for it.

"Q. Did he tell you he would buy it himself?

"A. Yes, he said he was going to buy it himself. And I said, 'All right.' "

After the negotiations had come to finality, the parties met at the office of the Title Insurance Company in Minneapolis. As to what there happened, she testified (S. C. 21):

"Q. At the time the deal was closed, that is the time that this note was signed? [The note for $560 representing the balance of the purchase price.]

"A. It was.

"Q. And is it or is it not a fact that the man from the Title Insurance Company who closed the deal pointed out to you that the balance was to be payable at the rate of $20 a month?

"A. Yes, he told me that at that time.

"Q. At that time?

"A. Yes.

"Q. And do you recall whether or not at that time the man from the Title Insurance Company pointed out to you that you were to receive no mortgage back?

"A. Yes.

"Q. That you were selling this property simply based upon a promissory note?

"A. Yes.

"Q. And you then signed the deed?

"A. Yes.

"Q. And the note was given to you?

"A. Yes.

"Q. Is that right?

"A. Yes.

"Q. And Kenneth was there with you at that time? [Kenneth is Mrs. Parrish's son, who was with her in the courtroom but did not testify.]

"A. Yes."

The testimony quoted was elicited on cross-examination. Her counsel then took the matter in hand, and the following appears (S. C. 25):

"Q. You were asked also if someone in the Title Insurance Company office pointed out to you that there was to be no mortgage, only a bare note. Do you know what a mortgage is?

"A. Well, I suppose that is if he doesn't pay for the property I can take it back."

The definition she gave of a mortgage does not to my mind indicate mental incompetency. That is about as good a definition as one might reasonably expect from the average lay person.

Mr. Peoples promptly paid the February and March installments on his note. Mrs. Parish accepted, endorsed, and cashed the checks he gave her. Nothing of difficulty appeared upon the horizon until the spring of 1942 (S. C. 11, 12), when one of her horses died. She went to Mr. Peoples and "asked him if I could get $100 be-

cause I had to buy a horse and some things to start the spring work with." He was unresponsive to her request, so she went to Mr. Bollum to see if she "could borrow some money on that note." But he, after looking the papers over, said, "You better take them papers in to your lawyer." She promptly acted upon his advice, and this suit was begun March 6, 1942, when, upon an *ex parte* application, signed by her, the senior partner of the law firm of Nelson & Malmgren was appointed guardian of her estate. The complaint in this suit was dated and filed with the clerk that day, and personal service of the summons was made on that date.

Unquestionably capable and experienced counsel knew that evidence to prove lack of "contractual capacity" must be secured if plaintiff were to succeed on that ground. Trial of the suit began May 25, 1942, so there was plenty of time for them to have procured "ample testimony on the issue of competency for the guidance of the trier of fact." Nor was the legal problem confronting them on this phase at all new or uncertain. They had but to turn to 2 Dunnell, Dig. & Supp. § 1731, for their cases under the heading "Contractual capacity." There they would find our cases cited under note 92, among them Rogers v. Central L. & I. Co. 149 Minn. 347, 351, 183 N. W. 961, 963, where we reversed the finding below that plaintiff lacked mental capacity to enter into the contract involved there. That finding had for its support the testimony of two witnesses who said that plaintiff lacked "mental capacity sufficient to look after and to take care of his interest in a transaction of the kind" there presented. Judge Taylor, writing for the court, said (149 Minn. 352, 183 N. W. 963):

"The rule to be applied in determining whether a contract may be avoided for lack of mental capacity to make it, as deduced from the prior decisions of this court, is stated in 2 Dunnell, Minn. Dig. § 1731, thus: *'Mere mental weakness does not incapacitate a person from contracting. It is sufficient if he has enough mental capacity to understand, to a reasonable extent, the nature and effect of what he is doing.'* This is the rule applied generally.

16 Am. & Eng. Enc. (2d ed.) 624; 22 Cyc. 1206; 14 R. C. L. 590.

"The evidence is clearly insufficient to sustain a finding of incompetency within this rule, or to' charge defendant's agent with any wrongdoing. Really the only basis for the claim of incompetency is the fact that plaintiff made an improvident contract for a man in his situation. But, as said by another court, the making of an improvident contract is not sufficient in itself to show lack of capacity to make contracts. If this were so, the number of incompetents would be legion." (Italics supplied.)

That case, which had been before this court before, is reported in 140 Minn. 295, 298, 168 N. W. 16, 17. There, Mr. Justice Bunn, in writing for a reversal of the verdict rendered in the court below, said this:

"Though it be true that plaintiff was not a man of average intelligence and that he had recently taken a cure for the liquor habit, it was still necessary for him to prove by a fair preponderance of the evidence that he was defrauded before he could secure a rescission of the transaction."

Other cases having a direct bearing upon this question are Morris v. G. N. Ry. Co. 67 Minn. 74, 69 N. W. 628, and Czyrson v. Roseau County Nat. Bank, 172 Minn. 420, 216 N. W. 224.

And in 1 Williston, Contracts (Rev. ed.) p. 747, § 254, the applicable rule is thus stated:

"According to the modern view actual mental assent is not material in the formation of contracts, the important thing being what each party is justified in believing from the actions and words of the man he is dealing with. Accordingly, if one dealing with a lunatic may reasonably suppose he is sane and makes a bargain with him on the assumption, there is no theoretical difficulty in the lack of mutual assent. Lunatics whose acts can deceive anybody are not so totally devoid of will that their words and acts can be compared to talking while asleep or signing a paper substituted by sleight of hand. It is necessary, however, for reasons of justice, that the *lunatic should be privileged to avoid*

*the contract if it is oppressive. As this is a personal privilege it may well be limited to cases where otherwise there would be hardship."* (Italics supplied.)

In this case there was nothing oppressive in defendant Peoples' conduct, no fraud, no misunderstanding, no deceit. Adequacy of consideration is not wanting, even if that were a controlling element, which it is not.

Other helpful cases lending some aid to the mentioned rule and its application are, amongst others, McAllister v. Rowland, 124 Minn. 27, 144 N. W. 412, Ann. Cas. 1915B, 1006; Champ v. Brown, 197 Minn. 49, 266 N. W. 94; Schultz v. Oldenburg, 202 Minn. 237, 277 N. W. 918. These cases and others have been cited and relied upon by this court in subsequent cases, our latest, Johnson v. Johnson, 214 Minn. 462, 8 N. W. (2d) 620. The logic of that opinion, so it seems to me, constitutes a complete barrier to plaintiff's cause here. While there the question was one of competence to enter into a marriage contract, whereas here it involves a small parcel of wet and marshy land, that does not furnish a sufficient distinction to justify upholding the marriage on the one hand and overturning this land deal on the other.

In view of the comments made as to the so-called excess acreage included in the conveyance, something further should be said. Mrs. Parrish was selling "that piece," which she "thought" contained about three acres. "That piece" was pointed out to Mr. Peoples by her boy Kenneth at her direction. She hired the surveyor, and again Kenneth's help came into play. When the survey had been completed and the plat drawn to scale, the south line as drawn thereon (S. C. 66) "don't run square," *i. e.,* it was not on a straight east-west line. Peoples went out to see Mrs. Parrish about it, explaining the defect and his desire to have it corrected. Mr. Peoples testified (S. C. 66) that she said: "Tell him [the surveyor] to square it up. I will call him." Thus the line was redrawn by the surveyor so as to "run square." This produced a small wedge-shaped parcel between the line as originally surveyed

and the line as corrected. The number of square feet contained in the wedge has not been computed by anyone, nor do I think this important, because a mere glance at the plat leaves no one in doubt that the additional area is too inconsequential to be considered in this case. Important, too, is the testimony of Sam W. Batson, a witness for plaintiff, who testified that (S. C. 40) "a quarter of the land" is marshy and about "a half acre" is occupied as a road, all included in the grant. After the plat had been corrected, Mr. Peoples again went to see Mrs. Parrish, and then she signed the corrected plat as containing the area to be included in the conveyance. Mrs. Parrish testified (S. C. 96): "That is the one [plat] I seen, and that is the only one."

What is said about the $560 note creates no justification for doubting Mrs. Parrish's capacity to contract. There is no suggestion that the note is unenforceable or that its payments will not be met. Mr. Peoples is a long-time resident and businessman of Minneapolis. Her statement when the note was given, that (S. C. 72) "Mr. Peoples has got too much property to try to beat me," discloses a discerning and reasoning mind rather than that of a mental incompetent.

The order should be affirmed.

LORING, JUSTICE (dissenting).
I agree with all that Mr. Justice Olson has said.

HILTON, JUSTICE (dissenting).
I concur in the dissent of Mr. Justice Olson.