## In Re KNOTT'S GUARDIANSHIP

(21 N. W.2d 59.)

(File No. 8779. Opinion filed December 17, 1945.)

**Bailey, Voorhees, Woods & Fuller,** of Sioux Falls, for Appellant.

**Davenport, Evans & Hurwitz,** of Sioux Falls, for Respondents.

SICKEL, J.   Ettie Knott and Joseph Martin Knott, her husband, came to Sioux Falls in 1910, and lived there together until the husband died July 3, 1943.   He left a will giving a large part of his estate to the widow.   The will appointed The First National Bank and Trust Company in Sioux Falls and the widow as executors.   On September 27, 1943, Roy Nelson Knott, a brother of decedent, applied to the county court for the appointment of The First National Bank and Trust Company as guardian of the widow's prop-

erty. At that time she resided in Wisconsin. The appointment was made without notice to anyone. Mrs. Knott appealed to the circuit court, where the order of appointment previously made by the county court, was affirmed. Then Mrs. Knott appealed to this court.

■ Appellant's first contention is that the county court was without authority to appoint a guardian for a person who is neither a minor nor insane, on the ground that she is physically incompetent to manage her own property.

The authority of the county court to appoint a guardian of the estate of a person who is found to be physically incompetent, is found in SDC 35.1802, which states:

"The county court, when it appears necessary or convenient, may appoint a guardian of the person and estate, or either, of a minor or of a person who is insane or for any cause mentally or physically incompetent to manage his own property, such person being hereafter in this title referred to as an incompetent. * * *"

The source of this provision of the statute was § 3505 of the Code of 1919. That section authorized the appointment of a guardian of an adult sane person, only in case he was mentally incompetent. Section 3506 of the Code of 1919, which was left out of the 1939 revision, provided for the appointment of a guardian for any person if "it appears to the court that the person in question is incapable of taking care of himself and managing his property." While the latter section did not qualify the word "incapable," neither did it authorize the appointment of a guardian on the ground of physical disability alone. In re Coburn, 165 Cal. 202, 131 P. 352. The language of SDC 35.1802 shows that the legislature intended to amend the Code of 1919 so as to authorize the appointment of a guardian for the estate of a person who is physically incompetent. The question presented by appellant is whether this amendment is constitutional. However we need not decide this constitutional question because of the conclusion we have reached on the question of mental incompetency.

■ Appellant also claims that the evidence is insufficient to justify the finding that Ettie Knott is mentally

incompetent to mange her own property. Such incompetency exists when the mental deterioration of old age, as exhibited by loss of memory, attention and comprehension, produces such a degree of senility that a person is unable to properly protect his own interests in his property. In re Thoreson's Guardianship, 72 N. D. 101, 4 N. W.2d 822; Parrish v. Peoples, 214 Minn. 589, 9 N. W.2d 225; Annotation 113 A. L. R. 354, Subdivisions XI, XII and XIII.

◼ The evidence shows that Ettie Knott was seventy-eight years old at the time of the trial. She had been physically helpless for many years as the result of multiple sclerosis. She could not hear well and her eyesight was poor. She was unable to sign her own name, and could only make her mark with assistance. While physical incapacity alone may not furnish a legal basis for the appointment of a guardian, it is a circumstance to be considered in determining the degree of mental competency required to properly manage her property. In re Thoreson's Guardianship, supra.

The evidence further shows that she and her husband made a joint will in 1938. The will was read and explained to her fully by her husband and their attorney. She approved the disposition of the property made by it, and signed it by mark. After the death of her husband in 1943, the will was read to her again and she consented to act as an executrix of it. She qualified as executrix though she admitted her inability to act. On June 28, 1944, and at the trial of this action, she denied not only her intention of making such a will, but also denied the execution of it either by herself or by her husband.

After her appointment as an executrix of her husband's will, a resignation was presented to her for signature. It was read and explained to her by a friend. She signed it by mark in the presence of two disinterested witnesses. Later her brother objected, so she asked to have it withdrawn and he destroyed it in her presence. At the trial she admitted signing it by mark but refused to state whether it had been read to her, or whether she understood it before signing it.

Two weeks after the death of her husband Mrs. Knott

had a conversation in her hospital room with her attorney, at which her brother Arthur Parsons was present. She stated that she could not handle her property and asked her attorney's advice. He suggested a trust agreement, a power of attorney, or the appointment of an agent. She asked for his preference and he recommended the trust agreement. She directed him to prepare it for her signature. He returned to his office to draft the instrument, and within a half hour Parsons appeared to say that Mrs. Knott had changed her mind. Within a week she called her attorney to the hospital again and substantially the same conversation was had as before. She had forgotten the previous conversation, and did not remember that her attorney had been there. She again directed him to prepare the trust agreement. The attorney returned to his office to do so and Parsons came to the office a second time to say that Mrs. Knott had changed her mind. The trust agreement was never drawn.

Sometime later an instrument appointing her brother as her attorney in fact was prepared for her execution. She signed it by mark in the presence of her brother, a notary, and a nurse, after it had been read and explained to her. At the trial she denied it had ever been read to her and that she had ever signed it.

The evidence contains many other instances showing loss of memory, inconstancy, and lack of understanding. On the contrary, physicians, nurses, businessmen and acquaintances testified in support of her claim of mental competency and the probative force of this evidence is not to be ignored. However, the conflicting evidence presents an issue of fact upon which impartial minds may reach different conclusions. As said In re Strom's Guardianship, 205 Minn. 399, 286 N. W. 245, 247:

"With the trial court necessarily rested the primary responsibility of determining fact issues. We are and should be guided by the fact that much must necessarily be left, especially in proceedings of this kind, to the sound judgment and discretion of the trial court. It has the advantage, not possessed here, of being confronted with

the witnesses, the alleged incompetent person, and the circumstances surrounding the entire proceeding. It is more capable than we of reaching a clear understanding of the situation and of the mental condition and capacity of the claimed incompetent person."

■ Ettie Knott is not a person of unsound mind. But there is substantial evidence to support a finding that her normal mental faculties have been deteriorated by senility to the extent that she no longer possesses the degree of mental alertness, stability and comprehension necessary to avoid the impositions of designing persons, or the waste that results from incompetent management of property. The evidence is therefore sufficient to justify the finding of the circuit court that she is mentally incompetent to manage her own property.

The judgment is affirmed.

ROBERTS and RUDOLPH, JJ., and RUDESILL, Circuit Judge, concur.

SMITH, P.J., not sitting.

RUDESILL, Circuit Judge, sitting for POLLEY, J.