IN RE GUARDIANSHIP OF ALBERT R. WOLFF.
ALBERT R. WOLFF v. ELSIE LERUM.[1]

October 27, 1950.

No. 35,323.

[1]Reported in 44 N. W. (2d) 465.

*Edward A. Nierengarten* and *J. E. Hendrickson,* for appellant.
*Lauerman & Pfeiffer,* for respondent.

KNUTSON, JUSTICE.

On the petition of Elsie Lerum, respondent here, the probate court of Renville county made and filed its order on December 30, 1948, appointing one Paul Kolbe as guardian of the estate of Albert R. Wolff. Respondent is a daughter of Albert R. Wolff. An appeal was taken to the district court, and the decision of the probate court was affirmed. The case is here on appeal from an order of the district court denying appellant's motion for amended findings or a new trial. The only question raised by the appeal is the sufficiency of the evidence to warrant the appointment of a guardian for Mr. Wolff as an incompetent.

M. S. A. 525.54, so far as here material, provides that the probate court may appoint a guardian of the person or estate, or both, of any person "who because of old age, or imperfection or deterioration of mentality is incompetent to manage his person or estate."

At the time of the appointment of the guardian Mr. Wolff was 80 years of age. His first wife died on December 24, 1947. They had been happily married for 57 years and during that time had accumulated considerable property by their industry and thrift, including a 200-acre farm estimated to be worth some $30,000. By this marriage they had three children, the daughter, Elsie, now Mrs. Lerum, a son Allen, and a son, Herbert, who died. The

relationship between the father and the mother and Elsie was ideal. Allen apparently had not been so fortunate, but had trouble domestically as well as financially. As a consequence of his domestic trouble, it appears that the Lerums had cared for Allen's daughter, Barbara, since she was a baby, she being some 10 or 11 years of age at the time of the trial. Prior to the death of the first Mrs. Wolff, she and her husband had executed joint wills, stated to be irrevocable, in which they had provided for Elsie and, out of Allen's share of the estate, had provided that Elsie should be paid for taking care of Barbara. It was also understood between them that when the first of the parents died the survivor would go to live with Elsie.

When Mrs. Wolff died Mr. Wolff chose to stay on the farm. With the help of Elsie, he procured a number of housekeepers between December 1947 and July 1948. On July 15, 1948, Mrs. Percival appeared on the scene as the new housekeeper, and almost immediately things began to change. Mr. Wolff's attitude toward Elsie became cool and distant. Although he admitted that she had always been honest and truthful, he now accused her of stealing his silverware. Mrs. Percival, within a matter of days, knew about the joint will that had been executed by Mr. Wolff and his former wife and the joint disposition they had made of their property, and she criticized the provisions of this will as silly. Mr. Wolff's attitude toward Barbara also changed. Prior to the appearance of Mrs. Percival he had manifested the kindliest of affection toward Barbara. He now became cold and did not care to see either Elsie or his granddaughter. Believing that Mrs. Percival was exercising complete domination over her father, Elsie petitioned for the appointment of a guardian. Mr. Wolff thereafter went to see Elsie at her home in Minneapolis to talk the matter over with her, and it was then arranged that Elsie and her husband would go to the farm the following Thursday to discuss the matter further. They drove to the farm, but when they arrived there they found no one at home and, instead, found a note from

the father on each door stating that he would not be at home that day or the next and that he would see Elsie in court on Saturday. On October 21, 1948, while the matter was pending in probate court, Mrs. Percival became Mrs. Wolff by marriage. Prior to coming to keep house for Mr. Wolff in July, she was a complete stranger.

There is no evidence that Mr. Wolff squandered his money or his property. Up to the time of the appointment of the guardian, he had always taken care of his routine business and had managed and looked after his farm and his other affairs. He apparently was in good health for a man of his age.

The appointment of a guardian over a person who, because of old age or other mental imperfections, is unable to manage his own affairs is intended for the purpose of protecting the person or estate of such ward, not for the purpose of depriving him of the right to manage his own affairs. It is always difficult to determine when it has become necessary to provide such protection for an aged person who has shown no disposition to squander his estate. It is, however, largely a question of fact based upon the opinion of the trier of facts before whom the proceeding comes, Parrish v. Peoples, 214 Minn. 589, 9 N. W. (2d) 225, and we should not disturb such finding on appeal unless it is obvious that there is no evidence reasonably tending to support it. In re Restoration to Capacity of Masters, 216 Minn. 553, 13 N. W. (2d) 487; In re Guardianship of Hudson, 220 Minn. 493, 20 N. W. (2d) 330.

Under our statute, the ultimate test is incompetence to manage his person or estate. In Keiser v. Keiser, 113 Neb. 645, 204 N. W. 394, the facts are quite similar to those we now have before us. The statute in Nebraska appears to be more restrictive than ours. On an appeal from the appointment of a guardian in that case, the Nebraska court said (113 Neb. 651, 204 N. W. 396):

"The descriptive words, 'mentally incompetent,' 'incompetent,' and 'incapable,' as used in sections 1589, 1590, Comp. St. 1922,

mean any one who, though not insane, is, by reason of old age, disease, weakness of mind, or from any other cause or causes, unable or incapable, unassisted, of properly taking care of himself or managing his property, and by reason thereof would be liable to be deceived or imposed upon by artful or designing persons. Mental incompetency or incapacity is established when there is found to exist an essential privation of reasoning faculties, or when a person is incapable of understanding and acting with discretion in the ordinary affairs of life. Where a person has insufficient mental capacity for the just protection of his property and his mental condition is such that he is guided by the will of others instead of his own in its disposition, a guardian should be appointed."

The above statement is applicable to the facts in the instant case. Taking the evidence most favorable to the prevailing party, as we must on appeal, we are convinced that the trial court was fully justified in coming to the conclusion that Mr. Wolff was so completely under the dominating influence of his new wife that the appointment of a guardian was necessary in order to preserve his estate.

On the petition of appellant in the above matter, we issued our alternative writ of prohibition, which was returnable on August 11, 1950, restraining the district court from proceeding herein subsequent to the appeal. The matters set forth in the petition for a writ of prohibition having now become moot, the writ is hereby quashed without costs or disbursements to either party insofar as the petition for a writ of prohibition is concerned.

Order affirmed.